**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**Western Division**

| | |
|---|---|
| **ANNE CUVELLIER and DAVID HILLS, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNISON AGREEMENT CORPORATION, UNISON INVESTMENT MANAGEMENT, LLC and REAL ESTATE EQUITY EXCHANGE, INC.,**<br><br>**Defendants.** | **CASE NO. _______________** |

## CLASS ACTION COMPLAINT

1. Plaintiffs, Anne Cuvellier and David Hills, individually and on behalf of all others similarly situated, through their undersigned counsel, file this Class Action Complaint against Unison Agreement Corporation, Unison Investment Management, LLC, and Real Estate Equity Exchange, Inc. (collectively, "Defendants" or "Unison") and allege as follows:

## I. BACKGROUND

2. Homeownership requires significant investment and is essential for financial stability. For many, their home is a primary source of generational wealth that will be passed on to their children and family members.

3. The equity homeowners build over time is often their largest asset, and an important piece of their overall economic wellbeing. Many homeowners access the equity in

their home to assist with other financial obligations, such as supplementing retirement, education, home improvements, or long-term care costs.

4. Today, the residential home equity market is valued at approximately $35 trillion dollars and is the largest asset class in the United States. The equity built over time traditionally belongs to the homeowner. But, in recent years, institutional and high-net-worth investors have been seeking to transfer this wealth from homeowners to themselves through illegal and predatory financial products like the one at issue in this case.

5. Unison was founded in the early 2000s to give investors access to the home equity market, without those investors actually having to own or sell the homes themselves to reap profits. To do this, Unison created a product, the Unison HomeOwner Agreement, that it claims is an “option” investment contract. Under the contract, Unison provides homeowners an upfront cash advance in exchange for a stake in the home’s future value.

6. To entice homeowners to enter into Unison HomeOwner Agreements, Unison falsely markets itself as a “partner” who will share in the transaction “fair and square.” It misrepresents that its product is a “simple” “loan alternative” that creates “no debt,” carries “no interest,” and requires no monthly payments.

7. First, Unison is not a partner with homeowners because it legally cannot be. the Unison HomeOwner Agreement arrangement rarely, if ever, ends up “fair and square” for the homeowner. Instead, Unison deploys a variety of mechanisms to ensure that it maximizes its return, at the homeowner’s expense. This includes requiring the homeowner to pay all costs and fees throughout the term of the agreement, and exerting significant control over Unison’s repayment amount.

8. Unison's product is a mortgage loan and/or consumer credit, or, in the alternative, a reverse mortgage loan. Unison gives homeowners a cash advance, secures homeowners' repayment obligation by recording a mortgage on the home, and homeowners are required to pay Unison back with substantial effective interest. The payment amount is often so exorbitant that homeowners must sell their home in order to pay, with many walking away from the sale with little to show for the equity they worked hard to amass over time.

9. Homeowners who enter into Unison HomeOwner Agreements have no way of knowing the realities of the product or its economic implications. This is because Unison seeks to circumvent applicable consumer protection and lending laws by falsely labeling its product an "option contract." Unison also engages in a variety of practices during marketing, signing, and servicing of the agreement that keep homeowners in the dark when it comes to the true nature of the transaction.

10. By the time homeowners start to piece together the truth of the Unison product they are already locked into the agreement, and their home is encumbered by a mortgage and security agreement. At this point, the only way out is to find a significant amount of cash, often in the six figures, to buy out Unison, or sell their home. Homeowners who have spent years working hard, saving, and building equity are left holding the bag, while Unison and its investors reap annualized profits of over 20%.

11. Anne Cuvellier (Ms. Cuvellier) and David Hills (Mr. Hills) are two Massachusetts residents currently ensnared in a Unison HomeOwner Agreement. Ms. Cuvellier, a 68-year-old social worker, entered into the agreement with her late husband, who has since passed away. After deducting fees and requiring the Cuvelliers to pay off certain debts, Unison advanced them

just $36,239. Based on a recent quarterly statement, Unison estimates that Ms. Cuvellier may owe as much as $241,651 to exit the agreement.

12. As Ms. Cuvellier tries to navigate the complex Unison HomeOwner Agreement on her own, she has already encountered significant trouble. When she recently sought a loan to make home repairs, Unison refused to authorize the loan because it would be secured by her home and therefore infringe on Unison's claim to her equity. As a result, she was forced to obtain a personal loan on less favorable terms. The agreement looms large over Ms. Cuvellier's financial future. If she is forced to sell her home soon, she will not receive enough of the proceeds to purchase another. Worse yet, if she delays a sale until the end of the agreement, she will be nearly 90 and will be forced figure out a new living situation at that time.

13. Mr. Hills, a 63-year-old semi-retired resident of Hyannis, Massachusetts, has lived in his family home for over 50 years. After purchasing it in 2008, he envisioned keeping it in the family by passing it on to his nieces and nephews. But, after receiving an initial Unison payment of $61,851.00 after fees, Unison estimates he now owes over $330,000. This significant payment threatens Mr. Hills' plans to keep his longtime home within his family, and his financial future.

14. Unison's HomeOwner Agreements have injured Ms. Cuvellier, Mr. Hills, and all other similarly situated Massachusetts homeowners in such agreements. These homeowners have been and continue to be harmed by Unison's unlawful conduct. These injuries include, without limitation, the fees and costs they paid to Unison for unlawful Unison HomeOwner Agreements, the increasing loss of equity in their homes, money they pay for the maintenance and upkeep of their homes which primarily benefits Unison because of its significant share in home equity, and the ongoing loss of agency over their homes. Ms. Cuvellier and Mr. Hills and similarly situated

Massachusetts homeowners are and continue to be subject to illegal contracts with Unison that increasingly benefit Unison over time, to their and other Massachusetts homeowners' detriment.

15. Ms. Cuvellier and Mr. Hills, on behalf of all similarly situated individuals, therefore bring this action against Unison for its violations of the Massachusetts Consumer Protection Act, the Massachusetts Uniform Commercial Code, the Massachusetts Consumer Credit Cost Disclosure Act, and Massachusetts's mortgage lending, reverse mortgage lending, and quiet title laws.

## II. JURISDICTION AND VENUE

16. This Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

17. Alternatively, the Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which there are more than 100 class members, the matter in controversy exceeds the sum of $5,000,000, and Defendants are citizens of a different state than that of at least one putative class member.

18. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57. There exists an actual controversy regarding the validity of contracts issued by Defendants, and the relief requested herein is necessary to declare the parties' contractual rights and duties and obligations under those contracts.

19. This Court has personal jurisdiction over Defendants because Defendants have transacted business in the Commonwealth of Massachusetts by offering and providing their HomeOwner Agreements in Massachusetts since at least 2017.

20. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts, omissions, or transactions giving rise to the claims occurred in this District, and this action

involves real property located in this District. Both named Plaintiffs reside in this District, and one of the named Plaintiffs, Anne Cuvellier, resides within the geographic area of this Division.

## III. PARTIES

21. Plaintiff, Anne Cuvellier, is a citizen of Massachusetts and resides in East Longmeadow, Massachusetts, located in Hampden County. Ms. Cuvellier is 68 years old.

22. Plaintiff, David Hills, is a citizen of Masschusetts and resides in Hyannis, Massachusetts, located in Barnstable County. He is 63 years old.

23. Defendant Unison Agreement Corp. ("UAC"):

a. is a Delaware corporation registered as a Foreign Corporation with the Secretary of the Commonwealth of Massachusetts with a principal place of business at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111;

b. originated the transaction at issue;

c. and is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. (REX).

24. Defendant Unison Investment Management, LLC ("UIM"):

a. is a Delaware corporation registered as a Foreign Corporation with the Secretary of the Commonwealth of Massachusetts and with a principal place of business at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111;

b. is an SEC-registered investment advisor;

c. provides investment advisory services to pooled investment vehicles (Funds). The Funds invest primarily in Unison HomeOwner Agreements, originated by Unison Agreement Corp. or securities issued by issuers or securitizations of Unison HomeOwner Agreements, including the Fund at issue in this case, Odin New Horizon Real Estate Fund LP;

d. together with its affiliates serve as general partners and investment managers of the Funds. Such affiliates are typically under common control and/or possess substantial identity of personnel and/or equity owners with UIM; and

e. is a wholly owned subsidiary of REX.

25. Defendant Real Estate Equity Exchange, Inc. (REX):

a. is a Delaware corporation with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

b. is the corporate parent of UAC and UIM; and

c. according to information it provides to consumers, does business under the names "Unison," "Unison Agreement Corp.," and "Unison Investment Management LLC," and establishes and maintains the websites and many materials for UAC and UIM.

26. The same persons dominate, control, and manage Defendants, namely Thomas Sponholtz (CEO of all three entities), Scott Case (CFO of all three entities), and Matthew O'Hara (CIO of UAC and UIM), among others.

27. Upon information and belief, Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

28. Together, Defendants' operation follows a closed loop designed to originate, assign, service, and profit from the same HomeOwner Agreements:

a. UAC originates and executes HomeOwner Agreements with homeowners and causes liens to be recorded against consumers' homes;

b. at or near closing, UAC assigns the HomeOwner Agreements and lien instruments to affiliated companies, funds, and/or trusts managed and/or controlled by UIM and related entities;

c. UIM and its affiliates act as servicer and asset administrator for the assigned agreements, including issuing payoff demands, issuing quarterly statements, managing accounting and "protective advances," and coordinating enforcement; and

d. REX sits at the top of the enterprise, controlling and profiting from the origination, assignment, servicing, securitization, and enforcement of the HomeOwner product.

29. Upon information and belief, at all relevant times, the corporate separateness of UAC, UIM, and REX is disregarded and the entities act interchangeably in marketing, contracting, servicing, and enforcement under the "Unison" brand. As an example, UIM's Form

ADV Part 2A notes that its affiliates (which include UAC and REX) are "typically under common control and/or possess substantial identity of personnel and/or equity owners."

30. Defendants are joined, by agreement, in a joint venture or common enterprise. They have combined their property, skill, and knowledge for the purpose of carrying out a single business enterprise, namely the origination, securitization and servicing of and realizing financial gains from the Unison products described herein.

31. In addition, or in the alternative, Defendants were, and are, the alter egos of one another. Adherence to the fiction of the separate existence of the Defendants would permit an abuse of the corporate privilege, sanction fraud, promote injustice, and result in inequitable consequence, such that any liability incurred by one Defendant is chargeable against the other.

32. Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are responsible for the acts of one another.

33. Unison operates in thirty states and Washington D.C., including over 240 metro areas.

## IV. FACTS

### A. Unison's Business Model is Investor Driven

34. According to Unison's 2024 Home Equity Report, the American home equity market has "reached new heights." As of June 2024, the market totaled $35 trillion. Older adults often have the highest level of home equity—valued at $14 trillion—because they have owned their homes the longest.

35. Across the country, including in Massachusetts, homeownership remains one of the most reliable ways to build wealth, primarily through the gradual accumulation of home

equity. In Massachusetts, between 2020 and 2025, the average household equity grew by 79%, reaching $336,878 in 2025.[1]

36. Home equity plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons are commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages.

37. In the early 2000s, Thomas Sponholtz (Sponholtz), the founder and Chief Executive Officer of Unison, got the "big idea" for Unison's home equity product.[2] The idea came to him while working at Barclays Global Investors and "looking around for large asset classes [he] could add to [his] client's portfolio."[3] Sponholtz noticed that the residential real estate market was largely untapped by institutional investors, despite it being the "largest asset class, both globally and in the U.S," making up about 40% of the consumer price index and 16% of the gross domestic product.[4]

38. The absence of institutional investors in the market was driven by the burdens associated with the traditional way of investing in and profiting from residential real estate, which requires purchasing a home and renting it or reselling it. Sponholtz recognized that this

---

[1] *How home equity has changed in every U.S. state since 2020*, CNBC MAKE IT (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/home-equity-changes-for-all-50-states-in-the-last-5-years.html (last visited on June 17, 2026).

[2] Podcast Transcription Session No. 103—Thomas Sponholtz & Jim Riccitelli, Lend Academy (2017), https://perma.cc/5RZ4-TP2K (last visited on July 9, 2026) (Podcast 103).

[3] *Id.*

[4] *Id.*

method of investment is often inefficient and comes with "tremendous amount of administrative cost in maintaining and being a property manager of [] homes."[5]

39. With investors in mind, Sponholtz created Unison. Unison gives investors access to the residential real estate asset class—that is, to the equity that individual homeowners accrue over time—through Unison's "equity sharing" product. In essence, this product is designed to allow Unison to claim a portion of homeowners' equity without taking on any of the concomitant costs, labor, burdens, or obligations of homeownership or real estate management.

40. To access this $35 trillion "asset class," Unison developed a consumer-facing contractual arrangement it calls the "HomeOwner Agreement."

41. Under the Unison HomeOwner Agreement, Unison provides homeowners with an upfront cash payment in exchange for a purported "option" to purchase a substantial percentage of the home upon a qualifying event, such as expiration of the agreement's thirty-year term, the homeowner's death, or the sale of the home. As discussed herein, Unison structures the transaction to both maximize its likelihood of repayment in sums far exceeding the amount that homeowners were initially advanced and to protect itself against losses.

42. Unison was launched in 2005. As of today, Unison's website boasts that the "total value of homes [it has] invested in across the country" is $8.8 billion.[6] Unison has agreements with over 17,000 homeowners and a wide geographical presence, operating in "33 states + Washington, D.C."[7]

43. Together, Unison notes, the markets in which it offers its product make up more than 81+% of U.S. real estate by value.[8] It is no coincidence that Unison operates in markets that

---

[5] *Podcast 103*, *supra* note 2.
[6] *Company: About Us*, UNISON, https://www.unison.com/about-us, (last visited on July 9, 2026).
[7] *Id.* *See also*, UNISON IM, https://www.unisonim.com, (last visited on July 9, 2026).
[8] *Id.*

represent the vast majority of the country's real estate value. Unison has a "10-year forecast on every house in America"[9] and uses its "proprietary investment decision engine" to carefully select the markets in which it will operate. The investment decision engine "capture[s] and integrate[s] the most recent market and industry research about real estate, demographic trends, and key economic indicators such as employment and population growth. … With this information, Unison seeks to invest in Unison HomeOwner Agreements on properties that it believes have a greater likelihood of appreciation."[10]

44. Unison touts the "unlimited upside and limited downside"[11] of its product to its investors, highlighting that "residential real estate has historically generated strong returns," and that its portfolios provide "low volatility and high risk-adjusted net returns."[12]

45. Unison's investment decision engine has paid off, at least for Unison and its investors. Notably, Unison describes "institutional investors" and "high net worth individuals" as "typical[]" investors.[13] Over the ten-year period from 2012 to 2022, Unison had a net annualized return of 20.7% for its investors.

46. In recent years, Unison has begun securitizing its product. To date, it has securitized over a billion dollars of its agreements in at least three different funds managed by Unison IM, including a $94.2 million securitization in March 2026.[14]

---

[9] *Podcast 103*, *supra* note 2.
[10] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=982540
[11] *About*, UNISON IM, https://www.unisonim.com/about-us, (this information appeared on Unison's website as of Mar. 25, 2026).
[12] UNISON IM, https://www.unisonim.com, (this information appeared on Unison's website as of Mar. 25, 2026). *See also About*, UNISON IM, https://www.unisonim.com/about-us, (this information appeared on Unison's website as of Mar. 25, 2026).
[13] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=982540
[14] Press Release, UNISON, Unison Announces Securitization of $94.2 Million Unison Home Equity Agreements (Mar. 26, 2026), https://www.unison.com/press/94-million-home-equity-agreement-securitization, (last visited on July 9, 2026).

47. The truth of Unison's business model is that it is designed to benefit its high net worth individual and large investors, not the homeowners it purports to be in "partnership" with.

**B. The Process and Structure of the Unison HomeOwner Agreement**

48. Homeowners who enter into a Unison HomeOwner Agreement all go through a similar process and execute the same form documents. At the outset of the Unison transaction, the homeowner is usually provided with an Offer Package. The Offer Package contains an offer letter, summary of financial terms and fees, conditions of offer, a notice containing important information, a Total Unison Cost Estimate (TUCE) and a notice to interested parties who are not signatories to the agreement.

49. Unison's Offer Package does *not* include copies of the full agreements to which the homeowner will ultimately be bound but instead directs them to contact a Unison representative for the documents. The Offer Packages do not emphasize the language informing homeowners that they may request copies of the agreements, but the packages do emphasize the offer's expiration date.

50. Before accepting the offer, homeowners often communicate with Unison representatives over email or the phone. Unison representatives use scripted communications that mislead homeowners about the nature of the agreement and omit material information about the terms of Unison HomeOwner Agreements.

51. Homeowners are required to pay Unison a transaction fee and other third-party fees at the time they sign the Offer Package.

52. After signing the Offer Package, Unison arranges for a closing meeting for the homeowner to sign the Unison HomeOwner Agreement, which includes four primary documents: the HomeOwner Covenant Agreement, the HomeOwner Option Agreement, the Memorandum of Unison HomeOwner Agreement, and the Unison HomeOwner Security

Instrument (which Unison says "may be a 'Deed of Trust' or 'Mortgage' depending on the state"). Unison refers to these four documents collectively as the "Unison HomeOwner Agreement." The Unison HomeOwner Agreement spans up to 100 pages and contains cross-references, dozens of definitions, many of which also contain cross-references, and several complex mathematical formulas for repayment. The agreement's documents have remained substantially similar throughout Unison's operation in Massachusetts.

53. Most homeowners see these documents for the first time at closing, which is typically short in duration and attended only by a non-Unison notary, if anyone at all, who cannot answer questions about the Unison HomeOwner Agreement's terms.

54. In addition to the four core Unison HomeOwner Agreement documents, other additional documents that comprise the transaction include, but are not limited to, the Unison Closing Statement, the Unison Homeowner Agreement Closing Instructions, a Deferred Maintenance Addendum, a Notice and Acknowledgment for Non-Signatories to the Agreement, a Cancellation Notice, and various title documents.

55. At the outset of the agreement, Unison provides homeowners an initial advance it calls the "Unison Investment Payment." The Unison Investment Payment is typically not more than 17.5% of the "Original Agreed Value" of the home, a value which is set by Unison.

56. The homeowner must pay all origination costs and fees associated with the agreement, including appraisal fees, transaction costs, and any settlement and closing costs (such as title, state taxes, and recording fees). These costs and fees are deducted from the Unison Investment Payment. Today, the transaction fee alone is 3.9% of the of the Unison Investment Payment and is typically thousands of dollars. This fee constitutes a finance charge.

57. In return for the Unison Investment Payment, homeowners grant Unison a percentage of the future value of their homes, which Unison calls its “Investor Percentage.” Unison’s Investor Percentage is multiple times the percentage of the “Original Agreed Value” paid to the homeowner via the Unison Investment Payment.

58. As an example, Ms. Cuvellier’s “Unison Investment Payment” was 17.5% of the Original Agreed Value of her home, whereas the “Investor Percentage” she will pay Unison at the conclusion of the agreement is 70%.

59. In some agreements, Unison provides a Cancellation Notice which says that the Unison HomeOwner Agreement “will result in a lien and security interest on your home.” Although a Cancellation Notice is included, the Notice itself does not fully inform homeowners of their right to rescind the transaction or otherwise comply with the requirements of Massachusetts law.

60. After the agreement is signed, Unison records a Mortgage and Security Agreement to secure its interest in the property. The Mortgage and Security Agreement grants Unison the statutory power of sale in the event of a breach.

61. The agreement term is set for thirty years, although according to Sponholtz, homeowners typically exit the agreement much earlier, after just ten years.

62. During the term of the agreement, the homeowner must comply with several obligations imposed by the agreement, or risk default. Those obligations include paying all costs for the home, such as insurance and property taxes, and the costs of maintenance and repair. The homeowner must maintain the home to Unison’s standard during the agreement.

63. Additionally, the home must remain owner occupied, with the homeowner maintaining the property as their “principal residence” throughout the term, “unless agreed to in

writing by Unison." The agreement also places restrictions on if and how homeowners can rent out their own homes and impose a "Maximum Debt Amount" that homeowners cannot exceed. Additionally, the agreement limits homeowners' ability to freely obtain additional financing and equity products secured by their home and can make refinancing difficult.

64. If the homeowner falls behind on insurance or property taxes, Unison can obtain forced place insurance and make "Protective Advances" to cover missed payments. Protective Advances accrue interest at 1.5% per month.[15]

65. At the conclusion of the agreement, the homeowner must pay Unison an amount called the "Investor Interest," which is determined by a formula that considers the "Ending Agreed Value" of the home (as defined by Unison) and the "Investor Percentage" identified at the start of the agreement, as well as any other unpaid obligations of the homeowner, such as any repair items identified by Unison in a Deferred Maintenance Addendum or any Protective Advances made by Unison. The many ways in which Unison can calculate its "Investor Interest" are discussed in detail in Section D. Unison controls this calculation as well as several others in the agreement to minimize its and investors' risk and to prevent homeowners from understanding the true cost of the Unison HomeOwner Agreement.

66. Unison secures its payment obligation in many ways. For example, homeowners are required to repay Unison an amount of money based on the ending value of the home when an "Exercise Event" occurs. The Unison HomeOwner Agreement defines the Exercise Events to include: (1) the sale or transfer of the property by the owner, (2) death of the last surviving owner, (3) expiration of the agreement's 30-year term, and (4) a material and uncured event of default by the homeowner. Homeowners will also have to pay Unison if they exit the agreement

---

[15] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 8.11 (PDF Page 25 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 8.11 (PDF Page 25 of 103).

early, during the "Restricted Period" or if they buy out Unison in a "Special Termination." These additional payment scenarios are discussed further herein.

67. According to the Unison HomeOwner Agreement, the homeowner must repay Unison in a single lump sum. No partial payments are permitted. And the agreement imposes, under many circumstances, a prepayment penalty.

68. When payment becomes due, many homeowners are unable to pay Unison without selling their home. If the homeowner initiates a sale to repay Unison, the homeowner must pay all costs associated with the sale, including closings costs and appraisal costs, which could be thousands of dollars.

69. The practical result of the Unison transaction is that to satisfy Unison's secured claim in 30 years or less, homeowners will be forced to repay Unison far more than the amount Unison initially advanced.

70. As an example, in December 2017, Ms. Cuvellier received an initial of advance of $57,137, before accounting for any transaction fees or debts that Unison required her to pay off. About eight and a half years later, Unison estimates that she may owe up to $241,651. For Mr. Hills, Unison estimates that is now entitled to between $236,301 and $331,103 but advanced only $61,851.00 to him only about eight years ago.

**C. Unison Misrepresents its Product as an "Option Contract" to Evade Credit, Mortgage, and Consumer Protection Laws.**

71. To ensure that homeowners are well-informed prior to entering consumer credit and mortgage transactions, Massachusetts has enacted a number of laws that, among other things, require disclosures, prohibit misleading advertising, protect against excessive interest rates, and in the case of reverse mortgages, mandate that borrowers first receive counseling.

72. To evade these laws, Unison claims that the Unison HomeOwner Agreement is "not a loan" and is instead an "option" contract because, according to Unison, the homeowner only has to pay if Unison decides, upon a triggering event, to "exercise its option" and acquire its interest in the value of the home. However, Unison cannot simply decide not to seek repayment, because even in the absurd scenario where Unison would voluntarily leave profits on the table, it owes a duty to its investors to earn a profit for them.

73. Unison further attempts to disguise its agreement as an option contract through the illusory "Purchase Price Balance" payment, which Unison prominently displays in the agreement and says in the Offer Package *will* be paid to the homeowner when Unison "exercises" its "option." The Purchase Price Balance is set as the difference between the Unison Investment Payment advanced at origination and the dollar value of the Investor Percentage at the time of origination.

74. But the Purchase Price Balance is not an actual second payment to the homeowner from Unison. Instead, it is the equity that already belongs to homeowners at the end of the agreement. If the homeowner had never entered into an agreement with Unison to begin with, they would receive the value of the purported Purchase Price Balance through the proceeds of a traditional sale of their home.

75. By affixing the "option" label to its product, Unison purports to have developed a self-serving regulatory vacuum, where ostensibly no credit or mortgage regulation is necessary or applicable.

76. Despite Unison's claim that the Unison HomeOwner Agreement is an "option to purchase contract," the product operates exactly like a home-secured mortgage loan—only with worse terms for borrowers and none of the protections provided by lending laws.

77. Unison's contracts and other documents contained in the closing package refer to Unison as the "lender" and homeowners as "borrowers."

78. The mortgage refers to the homeowners' payment "obligations" and its right to "performance of those obligations to [Unison] specified in the Unison HomeOwner Agreement, including, without limitation, payment of the Investor Interest under the Unison HomeOwner Agreement," including through foreclosure.

79. Sponholtz himself has described the Unison HomeOwner Agreement as "similar to any home financing transaction."

80. The structure of the transaction itself also indicates it is a mortgage loan or consumer credit product. Unison provides an advance of funds to be repaid at a later date, with a hidden finance charge that operates as substantial effective interest, secured by a home—otherwise known as both a mortgage loan and a form of consumer credit under Massachusetts law.

81. In the alternative, the Unison HomeOwner Agreement is a reverse mortgage because Unison advances money to homeowners with the expectation of repayment, secures the transaction by placing a mortgage and security agreement on the property, and requires repayment upon the expiration of a fixed term, the death of the homeowner, the sale or transfer of the dwelling, or a material and uncured event of default by the homeowner.

82. When properly labeled, Unison becomes subject to many state laws and regulations that require it to disclose the true cost and nature of the Unison HomeOwner Agreement to homeowners. But, because it claims itself an "option contract," Unison fails to comply with any of these laws and instead misrepresents the truth of its product and its business model to lure homeowners into the Unison HomeOwner Agreement.

**D. The Unison HomeOwner Agreement is Unfair and Deceptive Because it Misleads and Prevents Homeowners from Understanding Their Final Repayment Amount.**

83. The Unison HomeOwner Agreement is structured to prevent homeowners from understanding or determining the final payment amount.

84. The Unison HomeOwner Agreement's explanation of how the Investor Interest is calculated is a prime example of how difficult it is for a homeowner to understand what the final payment obligation will be.

85. According to the Unison HomeOwner Agreement, the "Investor Interest . . . shall be defined and calculated as the Investor Proceeds, if any, *plus* the Unpaid Owner Obligations, if any."[16] Investor Proceeds "shall be defined and calculated as follows: Ending Agreed Value *multiplied by* Investor Percentage *minus* the Unison Purchase Price Balance."[17]

86. To decode what this means, the homeowner must understand the definition of "Ending Agreed Value" which the Unison HomeOwner Agreement explains is calculated as "**Base Ending Agreed Value** . . . *minus any* Remodeling Adjustment* *plus any* Deferred Maintenance Adjustment."[18] The asterisk explains "If there is a Negative Remodeling Adjustment, the absolute value of that number is added rather than subtracted."[19] The terms "Remodeling Adjustment" and "Deferred Maintenance Adjustment" are defined, in Schedule A, among more than 80 other definitions.

87. The Unison HomeOwner Agreement lists several different options for how to calculate the "Base Ending Agreed Value[s]"– each of which contains its own defined terms

---

[16] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 10.1(c) (PDF Page 34 of 105) (emphasis in original); **Exhibit 3**, Hills Covenant Agreement at ¶ 10.1(c) (PDF Page 34 of 103) (emphasis in original).
[17] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 10.1(a) (PDF Page 34 of 105) (emphasis in original); **Exhibit 3**, Hills Covenant Agreement at ¶ 10.1(a) (PDF Page 34 of 103) (emphasis in original).
[18] **Exhibit 1**, Cuvellier Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 105); **Exhibit 3**, Hills Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 103).
[19] **Exhibit 1**, Cuvellier Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 105);**Exhibit 3**, Hills Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 103).

and/or additional formulas. The homeowner must determine which option applies to their situation and then sort through any applicable definitions and formulas embedded in each option.

88. In some instances, it is impossible to predict the final repayment amount because the Base Ending Agreed Value depends on information that is not known at the outset of the Unison HomeOwner Agreement.

89. For example, in a default scenario, the Based Ending Agreed Value is calculated as follows: "the greatest of the (i) Original Agreed Value, or (ii) the highest Appraised Value of the Property calculated between the date of the first Owner Event Of Default through the date of recording of Investor's release and reconveyance of the Option and the Unison HomeOwner Agreement Transaction Documents."[20] Obviously, at the outset of the transaction, the homeowner has no means of knowing what a future appraised value will be.

90. Nor can the homeowner predict the detrimental financial impact of the deferred maintenance process, discussed further herein, which allows Unison to identify certain maintenance items that, if not repaired by the homeowner during the Unison HomeOwner Agreement, can be added to the Ending Agreed Value at the conclusion of the Unison HomeOwner Agreement.

91. If a homeowner is able to determine the appropriate "Base Ending Value" calculation, they then must plug it into the "Ending Agreed Value" formula. Once the homeowner determines the "Ending Agreed Value," they can then, finally, attempt to determine the "Investor Interest."

92. As described in above, the Purchase Price Balance, one of the inputs into the "Investor Interest" formula also misleads homeowners about their final repayment obligation by

[20] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 10.4(f) (PDF Page 35 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 10.4(f) (PDF Page 35 of 103).

mischaracterizing it as a payment to homeowners upon an Exercise Event instead of as an offset to Unison's profits.

93. Understandably, any homeowner embarking on this byzantine set of cross-references, definitions, and confusing formulas would have difficulty discerning the amount they must pay Unison at the outset, during, or at the conclusion of the Unison HomeOwner Agreement.

94. Unison also includes a Total Unison Cost Estimate (TUCE) in its Offer Package. The TUCE similarly fails to disclose and further misleads homeowners about their repayment obligations by providing repayment scenarios that are based on hypothetical inputs, and not the individual homeowner's actual Unison HomeOwner Agreement. As a result, the TUCE provides the homeowner with no insight as to the potential repayment amounts under *their specific* Unison HomeOwner Agreement.

95. The TUCE also underestimates how much the homeowner can realistically expect to repay. As an example, the highest repayment scenarios included in the TUCE rest on an assumption that the home appreciates by up to about 40%. But historical market data shows that home values increased nationwide from $153,500 to $541,300 between 1995 and 2025,[21] which is an increase of 252.6%. Based on this historical market data, the TUCE significantly underestimates the potential repayment scenarios for homeowners who remain in the Unison HomeOwner Agreement long term or for the full 30-year term.

[21] *Average Sales Price of Houses Sold for the United States*, FRED, Fed. Rsrv. Bank of St. Louis (Feb. 20, 2026) https://fred.stlouisfed.org/series/ASPUS, (last visited on July 9, 2026) (average sale prices of houses sold in the United States).

96. Further, the TUCE fails to account for scenarios in which Unison is guaranteed repayment of at least the initial advance, such as a sale during the Restriction Period, a buyout through a Special Termination, or a forced sale in a default event.

**E. Unison's Entire Business Model Misleads Homeowners about the Truth of the Agreement and is Fundamentally Unfair by Ensuring an Outsized Return for Itself at the Expense of Homeowners**

97. To sell its predatory product, Unison deploys a uniform deceptive marketing campaign. Included in this campaign are uniform misrepresentations about Unison's product, delivered through marketing materials, its website and customer service scripts used Unison representatives use when interacting with prospective customers. To effectuate the deal, Unison uses uniform Offer Packages and form contractual documents that intentionally obscure the true nature and financial impact of the Unison HomeOwner Agreement. Throughout the process, Unison misrepresents to homeowners that it is not a loan, but rather an option contract, and that it is interest-free, debt-free, and does not require monthly payments. These statements are false and misleading.

98. Unison further tells homeowners in its solicitations, sales, and servicing communications that Unison is their partner, that they are in a partnership together, and that they equally share in the risk of the transaction. These statements are false and misleading. Unison is not in a partnership with homeowners.

99. In truth, Unison's business model is premised on generating the largest possible return *for Unison and its investors*, in ways that go well beyond just the simple sharing in the appreciation of the home.

100. Unison's statements regarding partnership are core elements of its marketing and communications to homeowners. Such statements appear multiple times throughout the

transaction. In marketing materials and on its website, Unison makes statements like "We win when you win" and "Unison is your partner, here when you need us."[22]

101. Additionally, a marketing video on Unison's website and YouTube also emphasizes the purported partnership aspect of the agreement. The video explains that Unison is a "partnership, fair and square, and yes, it's kind of cool."[23]

102. The video continues: "Again, we're partners … so we split the change in value of your home, even if your home depreciates, we actually take the hit alongside you. You heard that right. Either we both profit or we both share in the loss. That's what we mean by a fair partnership. We're truly there with you through the ups and the downs."[24] The video ends with "Everything is better when you do it in Unison." Even the Company's namesake is designed to convince homeowners of a partnership relationship.

103. Unison's representations that it will share in any decrease in value of the home is unfair and misleading because in certain circumstances, such as the Restriction Period and a Special Termination, Unison expressly disclaims a share of any depreciation. Moreover, because Unison's share of the home is so significant – up to 70% - the likelihood of it not receiving any profit is extremely low, as it tells its investors.

104. Unison continues this partnership theme in the Quarterly Statements it sends to homeowners during the course of the agreement. In those statements, Unison states it is a "financial partner" who would "love to help" if the homeowner is experiencing financial

---

[22] *Products: Equity Sharing Agreement*, UNISON, https://www.unison.com/equity-sharing-agreement, (this information appeared on Unison's website as of Nov. 6, 2025).
[23] Video: How it works, UNISON, https://www.unison.com/equity-sharing-agreement, (last visited on July 9, 2026); Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:42-45 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on July 9, 2026) (Unison Promotional Video).
[24] Unison Promotional Video at 1:15-34, *supra* note 27.

challenges.[25] According to the Quarterly Statement, homeowners can reach a Unison representative at "Unison Partner Services Team" at HomePartners@unison.com.

105. While the partnership theme is central to Unison's marketing campaign and carries through to its post-closing servicing communications with homeowners, the truth is that there is no partnership between homeowners and Unison.

106. Indeed, the Unison HomeOwner Agreement explicitly disclaims any such relationship with the homeowner, stating: "Investor shall not be deemed a partner . . . or fiduciary with, or of, Owner."[26] It included this disclaimer, buried in its voluminous agreement, despite making the partnership representations at the front end in its marketing and sale of HomeOwner Agreements, as well as in its post-sale servicing communications, because it knows these statements are false and misleading.

107. Further, as a SEC-registered investment advisor, UIM is legally required to act in the best interest of its clients—its investors—not in partnership with homeowners.

108. That Unison's true partner is its investors, to whom it does share a duty to earn a profit, is reflected throughout the Unison HomeOwner Agreement in multiple provisions designed to increase Unison's "share" of home value to homeowners' detriment and minimize its and its investors' risk of loss.

109. For example, one such way Unison increases its "share" of the home value is to discount the appraised value of the home at the start of the Unison HomeOwner Agreement to arrive at the "Original Agreed Value" of the home. Today, Unison discounts the appraised value by 5%. The discount to the home's value allows Unison to increase the final delta between the

---

[25] **Exhibit 2**, Cuvellier Quarterly Statement, 9/30/2025, at 1; **Exhibit 4**, Hills Quarterly Statement, 6/30/2026, at 1.
[26] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 9.3 (PDF Page 29 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 9.3 (PDF Page 29 of 103).

"starting" home value and the "Ending Agreed Value" of the home so that it can claim a larger pot of appreciation for itself at the end of the Unison HomeOwner Agreement. It also builds in an instant loss mitigation protection at the outset of the Unison HomeOwner Agreement.

110. Additionally, the discount in the Original Agreed Value adversely impacts the advance to the homeowner at the outset of the transaction and the repayment due to Unison at the end of the transaction. This is because both the Unison Investment Payment (the advance to homeowners) and the Purchase Price Balance (the offset of Unison's profits at the end of the transaction) are keyed off of the Original Agreed Value.

111. By reducing the value of the home before determining the dollar amount that the homeowner will receive, the homeowner is already receiving a discounted amount of equity at the outset of the agreement, in return for promising Unison a significant stake in the home's *undiscounted* future value.

112. The other ways  Unison shifts the risk of the transaction to homeowners is by requiring homeowners to pay thousands of dollars in transaction, home inspection, settlement, recording, and appraisal fees out of the initial Unison Investment Payment, further discounting the total dollar amount of the home value actually paid to the homeowner at the outset.

113. Unison also exercises wide control over the Ending Agreed Value, allowing it to ensure repayment or increase the amount of its repayment in several scenarios.

114. First, if the homeowner sells or terminates the contract during the "Restriction Period" which is either three years or five years after signing, depending on the Unison HomeOwner Agreement, Unison *will not share* in any decline in value. In this scenario, the "Base Ending Agreed Value" will be the Effective Sale Price or the Original Agreed Value,

*whichever is greater*.[27] This ensures that Unison is repaid the Initial Investment Payment, at a minimum, and is thus protected against short-term fluctuations in the real estate market.

115. Similarly, when a homeowner wishes to buy out Unison via a Special Termination, Unison is again protected against loss. In a Special Termination, the amount due to Unison is determined by using a "Base Ending Agreed Value" that is "equal to the greater of the Appraised Value of the Property at the time of the Special Termination, or the **Solicited Sale Value**."[28] But if the appraised value at the time of the Special Termination or the Solicited Sale Value would result in a loss to Unison, the Unison HomeOwner Agreement allows Unison to instead recover the Unison Investment Payment plus any Unpaid Owner Obligations.[29]

116. In a default, the financial penalties are even more burdensome. In this scenario, Unison can foreclose and force a sale of the home, whereby Unison can also seek additional liquidated damages. If Unison terminates the Unison HomeOwner Agreement due to certain default events, the homeowner is required to pay the "Unison Investment Payment," at a minimum, but also may have to pay the amount of the "Investor Interest" that "exceeds the Unison Investment Payment."[30]

117. Finally, in most scenarios involving the sale of the home, Unison determines the Ending Agreed Value of the home based on the gross proceeds of the sale, meaning the sale price *before* any costs or fees are paid by the homeowner. This means that when Unison determines

---

[27] *What is the "restriction period"? Can I sell my home at any time?*, UNISON, https://www.unison.com/faqs/question/esa-restriction-period (last visited on July 9, 2026); *see also What happens when I decide to sell my home?*, UNISON, https://www.unison.com/faqs/question/esa-selling (last visited on July 9, 2026); **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 10.4(b) (PDF Page 34 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 10.4(b) (PDF Page 34 of 103).

[28] **Exhibit 1**, Cuvellier Covenant Agreement at ¶¶ 6.2, 10.4(i) (PDF Pages 11, 35 of 105) (emphasis in original); **Exhibit 3**, Hills Covenant Agreement at ¶¶ 6.2, 10.4(i) (PDF Pages 11, 35 of 103)(emphasis in original).

[29] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 6.2 (PDF Page 11 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 6.2 (PDF Page 11 of 103).

[30] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 7.3(a) (PDF Page 14 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 7.3(a) (PDF Page 14 of 103).

the total value of the home from which it can extract its Investor Interest, it does not provide the homeowner with an offset for the costs they have paid.

118. Moreover, Unison may increase the Ending Agreed Value of the home through the Deferred Maintenance. At the outset of the agreement, Unison may note certain maintenance items that, if not repaired by the homeowner during the Unison HomeOwner Agreement, can be added to the Ending Agreed Value at the conclusion of the Unison HomeOwner Agreement. Unison determines the amount due from Deferred Maintenance by setting a "commercially reasonable estimate" in "consultation" with third-party inspectors and appraisers.[31]

119. A "partner" would not include such provisions, or would fully disclose the existence and impact of these provisions to the homeowner. But Unison does not make these disclosures. Instead, homeowners routinely do not even see the Unison HomeOwner Agreement documents until the day they sign them, at a rushed closing attended only by a notary that does not even work for Unison.

120. Unison makes a variety of other statements and representations that mislead homeowners about the nature of their relationship with Unison and the product itself. In marketing and advertising, Unison tells homeowners "[we] convert up to 15% of your home's value to cash, so you can live the life you really want" and that one can use the "wealth in your home to achieve your life goals."

121. However, Unison can exert significant control over what homeowners must do with the Unison Investment Payment. For example, Unison may identify certain debts, including unsecured debts, and then *require* homeowners to use the "wealth in [their] home" to pay off those debts with their initial advance in order to proceed with the transaction. This can result in

[31] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 8.4(a) (PDF Page 19 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 8.4(a) (PDF Page 19 of 103).

homeowners receiving only a fraction of what they anticipated at the outset of the Unison HomeOwner Agreement and in some instances, further encumbers their homes.

122. Unison's statements about the homeowner maintaining "control [of] the property and receiv[ing] the benefits of homeownership, such as occupancy rights" are also unfair and misleading. The reality is that the Unison HomeOwner Agreement imposes significant restrictions on homeowners, including restrictions on renting out the property, requiring the home to remain a primary residence, limiting the maximum total debt the homeowner can carry during the Unison HomeOwner Agreement, imposing limits on refinancing and other equity products, and granting Unison the right to interfere in a sale if it determines the sale price is too low.

123. These limits, particularly on other financing or equity products, can place homeowners in a difficult position. In Massachusetts, which is one of the five most expensive states for homeownership,[32] homeowners may need additional home financing products to complete repairs and maintenance.

124. As it relates to repairs and maintenance, Unison advertises a "Remodeling Adjustment" to homeowners, as a way for homeowners to purportedly receive credit for any improvements to their home during the Unison HomeOwner Agreement. In practice, however, the limits on the Remodeling Adjustment are significant. In order to qualify for the adjustment, the homeowner must pay for an appraisal to determine the value of the Remodeling Adjustment. This appraisal is based on the "Actual Value of the Property in its current condition" and the

[32] Katelyn Washington, *Most Expensive States for Homeowners in 2026*, KIPLINGER (May 29, 2026), https://www.kiplinger.com/taxes/most-expensive-states-to-live-in-for-homeowners.

Hypothetical Value based upon either the hypothetical absence of specified material modifications or a Prohibited Use."[33]

125. Unison retains broad discretion in this process, and because the Remodeling Adjustment is not applied until the end of the Unison HomeOwner Agreement, any improvement may receive little credit, as the appraiser will consider age and depreciation of the improvements.[34] If the Unison HomeOwner Agreement is terminated during the Restricted Period, no Remodeling Adjustment applies.

126. Unison also makes misleading representations about the amount homeowners will have to pay at the conclusion of the Unison HomeOwner Agreement in its communications with homeowners as well as its website and marketing materials.

127. On Unison's website, one Frequently Asked Question suggests a homeowner may owe *nothing* at the conclusion of the Unison HomeOwner Agreement. The question is "Is it possible I could end up owing Unison back less money at the end than I received at the beginning?" The answer is:

> "Yes. Unison is not a loan; we are invested in your home alongside you, so we win and lose together. Though such cases are not common, with significant decline in your home's value–something neither of us are looking for!--it is possible that the value of the agreement, and your ending amount due to Unison, would be $0. It's this feature along with the absence of any monthly payments that distinguishes an equity sharing agreement from a loan."[35]

---

[33] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 8.5(d) (PDF Page 20 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 8.5(d) (PDF Page 20 of 103).
[34] **Exhibit 1**, Cuvellier Covenant Agreement at ¶ 8.3(b)(ii) (PDF Page 18 of 105); **Exhibit 3**, Hills Covenant Agreement at ¶ 8.3(b)(ii) (PDF Page 18 of 103).
[35] *Is it possible I could end up owing Unison back less money at the end than I received at the beginning?*, UNISON, https://www.unison.com/faqs/question/esa-owing-less, (last visited on July 9, 2026).

128. Highlighting a remote scenario in which a homeowner may owe $0 at the conclusion of the Unison HomeOwner Agreement despite Unison's one-sided agreement misleads homeowners about the total costs and risks associated with Unison's product.

129. In fact, for both Ms. Cuvellier and Mr. Hills, for Unison to recoup $0, their homes would have to decrease 25% in value from the dates they entered the agreements. Such a precipitous decline would be unprecedented. Even during the steepest housing value drop in Massachusetts in over fifty years, during the 2008 financial crisis, housing prices only fell by around 17%.[36]

130. Unison also misleads homeowners about the potential amount due at the conclusion of the Unison HomeOwner Agreement with its statements about the product being interest-free. These statements are unfair and deceptive because in nearly all circumstances, homeowners will owe more money than they were initially advanced, constituting a finance charge and resulting in what is effectively an interest rate. Additionally, if Unison makes protective advances on behalf of a homeowner, those explicitly accrue interest at 1.5% per month.

131. Unison also repeatedly emphasizes that its product does not create debt. This is unfair and deceptive. Debt is a future payment obligation, and the Unison HomeOwner Agreement creates a future payment obligation for homeowners.

132. Unison's statements that its product is not a loan are unfair and deceptive for the reasons discussed herein and are designed to evade applicable laws and disclosures while luring homeowners into its product, rather than other, potentially more suitable, equity products. In

[36] *See* U.S. Federal Housing Finance Agency, All-Transactions House Price Index for Massachusetts [MASTHPI], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/MASTHPI, July 16, 2026. Housing price index decline calculated from the high point in Q1 of 2006 to the low point in Q2 of 2012. Housing prices have risen significantly since 2012.

Quarterly Statements to homeowners, Unison continues to describe itself as an "equity-sharing agreement" rather than a loan.[37]

133. Unison also emphasizes throughout its website and promotional videos that there are no monthly payments. This is unfair and deceptive because the homeowner must continue to make monthly payments under the Unison HomeOwner Agreement, such as property taxes, insurance, and mortgage payments, if applicable.

134. Finally, Unison continues to make unfair and misleading statements to homeowners throughout the Unison HomeOwner Agreement in Quarterly Statements. For homeowners in the Restriction Period, the repayment amounts in the Quarterly Statement, particularly the "low" estimated repayment are inaccurate to the extent they contemplate that the homeowner may owe Unison less than the initial advance, even though Unison disclaims any losses during the Restriction Period. They are also inaccurate for homeowners who wish to pursue a Special Termination. For others, the range of repayment amounts is often so large it does not actually provide the homeowner with any real insight into their financial obligations. And the estimates do not account for the many other ways that Unison can increase the amount the homeowner must pay, including the required payment of fees and costs, any Deferred Maintenance charges, and any Protective Advances and accrued interest during the Unison HomeOwner Agreement.

135. As the result of these provisions that protect Unison investors at the expense of homeowners, Unison's portfolio has achieved a net annualized return of more than two-fold the stock market's average.

[37] **Exhibit 4**, Hills Quarterly Statement at 2.

136. Moreover, the impact of Unison's repeated and prolific misrepresentations is that homeowners have no real understanding of the Unison HomeOwner Agreement into which they are entering. They believe the Unison HomeOwner Agreement is simple, easy, and allows them to access their home equity with no interest or monthly payment obligations.

137. In reality, while homeowners may get an immediate influx of cash at the start of the Unison HomeOwner Agreement, they are severely limited in their control over their home during the Unison HomeOwner Agreement, and risk losing their home or selling for very little return for themselves at the conclusion of the Unison HomeOwner Agreement.

**F. The Named Plaintiffs' Transactions**

**1. Anne Cuvellier**

138. Ms. Cuvellier is a social worker at the Capitol Region Education Council River Street School in Windsor, Connecticut, working with students who have autism and behavioral needs. She is 68 years old and has been residing in her home since 1990. Her husband, Robert Cuvellier, was a special education teacher for over 35 years. He passed away in 2021.

139. In 2017, Mr. and Ms. Cuvellier (the Cuvelliers) entered into a Unison HomeOwner Agreement. Mr. Cuvellier was ill with liver disease at the time.

140. Mr. Cuvellier told Ms. Cuvellier that they would receive about $60,000 to pay off some debt, and that he felt comfortable with Unison because Unison made him feel he could call anytime and talk to a Unison representative. Mr. Cuvellier informed Ms. Cuvellier based on his discussion with Unison that the $60,000 was interest-free and could be paid off later.

141. On or about December 21, 2017, a person came to the Cuvelliers' home for the closing, which occurred quickly and was the first time Ms. Cuvellier saw any documents. Due to the rushed nature of the signing, the Cuvelliers inadvertently signed two identical Cancellation Notices even though they did not intend to cancel at the time of signing. The Cancellation

Notice, dated December 21, 2017, only gave the Cuvelliers until December 23, 2017, to cancel the transaction.

142. Ms. Cuvellier does not believe she was provided with a signed or countersigned copy of any of the documents after the closing.

143. On December 21, 2017, the same day the Cuvelliers entered into the Unison HomeOwner Agreement, Unison Agreement Corporation assigned all rights and interests under the contracts to Odin New Horizon Real Estate Fund LP.

144. On December 28, 2017, Unison recorded the Unison Homeowner Mortgage and Security Agreement on Ms. Cuvellier's property in the Hampton County Registry of Deeds.

145. The Unison Investment Payment in the Cuvelliers' HomeOwner Agreement was set at $57,137, but after deducting various fees and requiring the Cuvelliers to pay off certain debts, they received just $36,329.29 of the anticipated initial advance. Included in the fees and costs were a $1,428 transaction fee paid to Unison, a $437.50 "Home Inspection Fee" to Unison," a $850 "Settlement or Closing Fee" to Lenders Title Solutions, a $490 fee to the title company's attorney, a $400 Recording Fee, and a $247.50 "Appraisal Fee" to AJS Appraisal Group, Inc. Unison also imposed a required payoff to Digital Federal Credit Union for a second mortgage in the amount of $16,954.71.

146. In return for a total cash advance of $36,329.29, Unison received a 70% interest in Ms. Cuvellier's home.

147. Unison represents in the documents provided to Ms. Cuvellier that the total "Purchase Price" for its so-called "option" in her home is $228,550. This includes the $57,137 Unison Investment Payment (before fees and debt payoffs) at the outset of the transaction and another purported payment of $171,413, called the "Purchase Price Balance." The "Purchase

Price Balance" is purportedly the second payment paid out at the termination of the agreement, whether through a sale of the home or a buyout.

148. However, the total "Purchase Price" of $228,550 is misleading because the purported second payment of $171,413 is not an actual payment or benefit that Unison pays to Ms. Cuvellier. Instead, it is simply part of her home equity that she would always recoup at the time of a sale, whether or not she ever entered into an agreement with Unison.

149. In reality, the only cash payment Ms. Cuvellier received from the Unison HomeOwner Agreement was the $36,329.29 portion of the Unison Investment Payment that was deposited into the Cuvellier's account at the outset of the agreement. For that so-called benefit, Ms. Cuvellier could now owe more than $240,000 to Unison, as of September 30, 2025, which Unison has the right to recoup through a forced sale of her home.

150. Unless Ms. Cuvellier obtains authorization from Unison, which Unison can grant or deny in its "sole and absolute discretion," she is not permitted to rent her home, move out of her home, or take out other loans against her home that exceed a maximum debt limit set by Unison. She also cannot sell her home without Unison's involvement and approval.

151. During the Unison HomeOwner Agreement's term, Ms. Cuvellier is responsible for all costs associated with the property, including upkeep and maintenance of the property, timely payment of all taxes, of insurance, timely payment of her mortgage, payment of all other fees and costs during the term of the contract, and avoidance of any liens. If Ms. Cuvellier falls behind on required payments, Unison can make "Protective Advances" on her behalf, that accrue interest at 1.5% per month.

152. Ms. Cuvellier's Unison HomeOwner Agreement includes a Deferred Maintenance Addendum, under which she is required to make repairs to the property identified by Unison

before the agreement terminates, and if she does not, Unison reserves the right to reduce the amount that it pays to her based on its own "commercially reasonable" estimate of the amount required to make the repairs, made in "consultation" with third-party inspectors and appraisers. This estimate is independent and without reference to any estimate of repair costs Ms. Cuvellier obtains.

153. If Ms. Cuvellier fails to comply with these obligations to Unison's satisfaction, Unison can force a sale of the home and recover all amounts that it would be due under the contract and can sue her for liquidated damages in the amount of its investment, as well as multiple other remedies.

154. In or around September 2024, Ms. Cuvellier applied and got preliminarily approved for a $60,000 loan from Freedom Credit Union to do maintenance work on her home. However, Unison refused to authorize the loan because it would be secured by her home and therefore infringe on Unison's claim to her equity. As a result, Ms. Cuvellier was forced to obtain a personal loan with a higher interest rate to complete the repairs.

155. Based on a recent quarterly statement Unison sent to Ms. Cuvellier, if Ms. Cuvellier terminated the Unison HomeOwner Agreement now, Unison estimates that it will receive anywhere up to $241,651 – which is more than four times the Unison Investment Payment of $57,137 to Ms. Cuvellier.

156. As described above, each quarterly statement contains misleading representations and further perpetuates Unison's unfair conduct and deception and causes Ms. Cuvellier stress.

157. Ms. Cuvellier has and continues to be harmed by Unison's unlawful conduct. These injuries include, without limitation, all fees and costs she paid to Unison for an unlawful predatory loan, all money she pays for taxes, insurance, and maintenance and upkeep of her

home, which mostly benefits Unison in light of its outsized share in her equity, the increasing loss of equity in her home, the continued loss of agency over her home, being misled and deceived by Unison's repeated misleading representations, and the stress she experiences both from being bound by the Unison HomeOwner Agreement and from Unison's ongoing communications with her indicating how much it claims that she owes.

158. If Ms. Cuvellier reaches the end of the 30-year term, she will likely be forced to sell her home because she does not anticipate having sufficient cash on hand to buy out Unison at that time. At the end of the 30-year term, Ms. Cuvellier will be approaching ninety.

159. The ongoing Unison HomeOwner Agreement causes Ms. Cuvellier stress and anxiety about the future, as she wonders whether she will be able to stay in the house that she has called home for nearly 40 years.

**2. David Hills**

160. Mr. Hills is 63 years-old and lives in Hyannis, Massachusetts. After working for Comcast/Xfinity for over 20 years, he is now semi-retired and has a seasonal job with the Massachusetts Department of Conservation and Recreation, working approximately six months out of the year.

161. Mr. Hills lives in his long-time family home, where he has resided for almost 55 years, since 1972. He purchased the family home in or around 2008 and he currently lives there with his 87-year-old mother and his brother. Mr. Hills has long planned to pass the home on to someone else in his family, most likely his nieces and nephews.

162. Sometime in late 2017 or in 2018, Mr. Hills received a postcard in the mail advertising the Unison HomeOwner Agreement. At the time, he was 55 years old.

163. Mr. Hills contacted Unison and inquired about the advertisement. He understood from talking to Unison that the Unison HomeOwner Agreement would give him a cash advance

with no monthly payments, that he did not have to repay Unison until he sold his home, and that Unison would be in a partnership with him, sharing in any profit or loss on his home. This provided Mr. Hills with comfort about the transaction. Based on the representations made by the Unison representative, Mr. Hills decided to move forward with the transaction.

164. Unison emailed Mr. Hills an Offer Package to electronically sign and later faxed the Unison HomeOwner Agreement to him for execution.

165. The documents contained numerous proprietary definitions and layers of cross-references as well as several complex formulas that were confusing and hard to understand. Unison did not provide Mr. Hills with state or federally required lending disclosures.

166. Mr. Hills did not understand the contents of the various documents presented to him for signature.

167. On November 14, 2018, Mr. Hills executed the Unison HomeOwner Agreement. There was no Unison representative or anyone else present when Mr. Hills executed the agreement. Mr. Hills was not provided a countersigned copy of any of the documents.

168. Although Mr. Hills signed the Unison HomeOwner Agreement on November 14, 2018, the effective date of the agreement is listed as November 12, 2018. Additionally, on November 12, 2018, before Mr. Hills had seen or signed the Unison HomeOwner Agreement, Unison Agreement Corp. assigned all rights and interests under four separate contracts to Odin New Horizon Real Estate Fund LP.

169. On May 17, 2019, Unison recorded the Mortgage and Security Agreement with the Barnstable County Registry of Deeds.

170. Mr. Hills' ex-wife, Solange Silva Hills, was also a signatory to the Unison HomeOwner Agreement, but she was removed on October 8, 2024 by an addendum to the agreement.

171. The Unison Investment Payment to Mr. Hill was set at $63,437. After a $1,586.00 transaction fee paid to Unison was deducted, Mr. Hills received a total cash advance of $61,851.00, in return for granting Unison a 70% interest in his home.

172. Unison represents in the documents provided to Mr. Hills that its "Purchase Price" for its so-called "option" is $253,750. This includes the $63,437 Unison Investment Payment (before fees) at the outset of the transaction, and a purported remaining second payment of $190,313 called the "Purchase Price Balance." The Purchase Price Balance is the purported second payment paid out at the termination of the Unison HomeOwner Agreement, whether through a sale of Mr. Hills' home or a buy-out.

173. However, the total "Purchase Price" of $253,750 is misleading because the purported second payment of $190,313 is not an actual payment or benefit that Unison pays to Mr. Hills. Instead, it is simply part of his home equity that he would always recoup at the time of a sale, whether or not he ever entered into an agreement with Unison.

174. In reality, the only payment or purported benefit Mr. Hills received from the Unison HomeOwner Agreement is the $61,851 deposited into his account at the outset of the transaction. For that so-called benefit, Mr. Hills could now owe more than $330,000 to Unison.

175. Unless Mr. Hills obtains authorization from Unison, which it can grant or deny in its "sole and absolute discretion," he is not permitted to rent his home, move out of his home, or take out other loans against his home that exceed a maximum debt limit set by Unison. He also cannot sell his home without Unison's involvement and approval.

176. Mr. Hills is responsible for all costs associated with the property, including upkeep and maintenance of the property, timely payment of all taxes and insurance, timely payment of his mortgage, and payment of all other fees and costs during the term of the contract. If Mr. Hills falls behind on required payments, Unison can make "Protective Advances" on his behalf, that accrue interest at 1.5% per month.

177. Mr. Hills' Unison HomeOwner Agreement includes a Deferred Maintenance Addendum, under which he is required to make repairs to the property identified by Unison before the agreement terminates, and if he does not, Unison reserves the right to reduce the amount that it pays to him based on its "commercially reasonable" estimate of the amount required to make the repairs, made in "consultation" with third-party inspectors and appraisers. This estimate is independent and without reference to any estimate of repair costs that Mr. Hills obtains.

178. If Mr. Hills fails to comply with these obligations to Unison's satisfaction, Unison can force a sale of the home and recover all amounts that it would be due under the contract and can sue him for liquidated damages in the amount of its investment, as well as multiple other remedies.

179. Mr. Hills plans to remodel the bathroom of the in-law apartment to his house to make it more accessible for his 87-year-old mother. Although Unison advertises a "Remodeling Adjustment" as a way for homeowners to purportedly receive credit for any improvements to their home during the Agreement, the limits on the Remodeling Adjustment are significant. For Mr. Hills to receive the adjustment, he must pay for an appraisal to determine the value of the Remodeling Adjustment.[38] Unison retains broad discretion in this process, and because the

---

[38] **Exhibit 3**, Hills Covenant Agreement at ¶ 8.5(e) (PDF page 20 of 103).

Remodeling Adjustment is not applied until the end of the Unison HomeOwner Agreement, any improvement may receive little credit, as the appraiser will take into account age and depreciation of the improvements.[39]

180. Mr. Hills has found the remodeling process to be burdensome. He did not contemplate that he would need to pay for an appraisal to determine the value of the Remodeling Adjustment, or that the Remodeling Adjustment is not applied until the Unison HomeOwner Agreement is settled. Because the appraiser will consider the age and depreciation of the improvements, Mr. Hills is concerned he will get little to no benefit from the improvements he plans to make to his home. As a result, he does not fully understand if or how the Remodeling Adjustment will ultimately lower his payment to Unison.

181. Within the past year or so, Mr. Hills has received assessments from the Town of Barnstable for a water remediation plan that he will be required to implement at his home. The estimated assessments from the Town range from $10,000 to $12,000. He is concerned about his ability to obtain financing for a municipal loan due to his Unison HomeOwner Agreement. Without financing, he is not sure how he will be able to implement the required remediations.

182. Based on the June 30, 2026 quarterly statement from Unison, if Mr. Hills terminated the Unison HomeOwner Agreement now, Unison estimates that it will receive up to $331,103, which is more than five times the amount Unison advanced to Mr. Hills.

183. As described above, each quarterly statement contains misleading representations and further perpetuates Unison's unfair conduct and deception and causes Mr. Hills stress.

184. In addition to what he will owe Unison at the conclusion of the Unison HomeOwner Agreement, Mr. Hills also owes approximately $126,000 on his primary mortgage.

---

[39] *Id.*

He pays the mortgage himself, and the monthly payments are affordable for him, but he worries about what will happen if he is required to sell his home to pay Unison. After paying his primary mortgage, and Unison as much as $330,000 he will not have much home equity left from a sale of his home.

185. Mr. Hills has and continues to be harmed by Unison's unlawful conduct. These injuries include, without limitation, all fees and costs he paid to Unison for an unlawful predatory loan, all money he pays for taxes, insurance, and maintenance and upkeep of his home, which mostly benefits Unison in light of its outsized share, the increasing loss of equity in his home, the continued loss of agency over his home, being misled and deceived by Unison's repeated misleading representations, and the stress he experiences from being bound by the Unison HomeOwner Agreement.

186. If Mr. Hills reaches the end of the 30-year term, he will likely be forced to sell his long-time family home because he does not anticipate having sufficient cash on hand to buy out Unison at that time. At the end of the 30-year term, Mr. Hills will be 85 years old.

## V. CLASS ALLEGATIONS

187. Plaintiffs bring this action for themselves and on behalf of the following Class of which they are members under Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), and/or 23(c)(4).

188. Plaintiffs seek certification of the following Class, defined as:

All Massachusetts residents who entered into a Unison HomeOwner Agreement.

189. The Class is so numerous that joinder of all members is impractical. While the exact number and identity of Class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery, Plaintiffs believe that there at least one hundred Class

members based on publicly available information. The precise number and identification of the Class members will be ascertainable from Defendants' business records.

190. There are questions of law and fact common to all members of the Class. Those common questions include, but are not limited to, the following:

a. whether the Unison HomeOwner Agreement is a loan under Massachusetts laws;

b. whether Defendants have violated Massachusetts law including by:

(i) Violating G.L. c. 93A, § 2; and/or

(ii) Violating 940 C.M.R. § 3.01 *et seq.*; and/or

(iii) Violating G.L c. 106, § 2–302; and/or

(iv) Violating G.L. c. 183, § 67, G.L. c. 167E § §§ 7, 7A, and/or

(v) Violating G.L. c. 140D, § 1 *et seq*.,.; and/or

(vi) Violating 940 C.M.R. § 8.01 *et. seq.*; and/or

(vii) Violating G.L. c. 271 § 49(a); and/or

(viii) Violating G.L. c. 240, §§ 6–10.

c. whether Defendants failed to disclose the true cost and terms of the Unison HomeOwner Agreement;

d. whether Defendants' misrepresented the nature of Unison HomeOwner Agreements as "option" contracts, "not loans," "not debt" and their relationship with homeowners as "partnerships,"

e. whether Defendants' mortgages are invalid and/or unenforceable;

f. whether Plaintiffs and Class members have been injured and the proper measure of restitution or damages; and/or

g. whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief.

191. Plaintiffs' claims are typical of the Class claims because they, like the Class members, entered into a Unison HomeOwner Agreement with Unison. Plaintiffs' and the Class

members' claims arise from Unison's standardized contracts; Unison's use of substantially the same material terms, including with respect to the structure of its advance payments; Unison's entitlement to repayment, Unison's purported "option" mechanism for ensuring its future payment; the homeowner's obligations secured by a security interest in a residence, provisions preventing homeowners from having agency over their homes, and unform deceptive characterizations of the product and Unison's relationship with homeowners.

192. Plaintiffs will fairly and adequately protect the interests of the Class because they share the same interest in challenging Unison's practices as the rest of the Class, their interests do not conflict with the interests of the Class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

193. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims. The Class claims stem from Unison's uniform and common business practices, including the use of form documents, uniform advertising and marketing, and common formulas for calculating payments due under the Unison HomeOwner Agreement. These common and uniform practices, among others, have resulted in uniform violations of law, and these issues will predominate over individualized ones. Thus, there will be no difficulty in the management of this action as a class action.

194. Members do not have an interest in pursuing separate actions against Unison, as the value of each Class member's individual claim is small relative to the substantial expense, burden, and uncertainty of individual prosecution. Class certification will obviate the need for

unduly duplicative litigation, which might result in inconsistent judgments and/or a burden on judicial resources.

195. Unison has acted or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole.

## VI. CLAIMS FOR RELIEF

### COUNT I
### Unfairness, Oppressiveness, and/or Unconscionability
### (Violations of G.L. c. 93A, § 2; 940 C.M.R. § 3.16; G.L c. 106, § 2–302)

196. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

197. The Massachusetts Consumer Protection Act, G.L. c. 93A § 2, prohibits unfair and deceptive acts and practices in trade or commerce.

198. It is a violation of G.L. c. 93A § 2 if an act or practice is oppressive or otherwise unconscionable in any respect, fails to comply with existing statutes, rules, regulations or laws meant for the protection of the public welfare and/or violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes. 940 C.M.R. § 3.16 (1).

199. The Unison HomeOwner Agreement is an unfair product in violation of G.L. c. 93A § 2 and is further oppressive or otherwise unconscionable in violation of 940 C.M.R. 3.16(1).

200. In addition, the Unison HomeOwner Agreement was unconscionable at the time it was made, and application of the contract will lead to an unconscionable result. As a result, the contract is unenforceable under G.L c. 106, § 2–302.

201. Defendants are large sophisticated financial companies with superior bargaining power.

202. The terms of the Unison HomeOwner Agreement are substantially one-sided in favor of Defendants and guarantee a substantial rate of return to Defendants at very limited cost or risk, while placing an outsized burden of the costs and risks on consumers.

203. There is a gross disparity in the consideration between consumers and Defendants under the Unison HomeOwner Agreement.

204. The cost of the Unison HomeOwner Agreement to the consumer substantially exceeds the cost of other mortgage-secured consumer financial products, including products that the Massachusetts legislature has prohibited or otherwise restricted.

205. Defendants fail to disclose the true cost of the Unison HomeOwner Agreement to consumers in their marketing and sales communications and in their contracts. Defendants drafted and structured the contract to hide the impact of the transaction.

206. Defendants' business model is designed to hedge against losses and shift the cost and risk of the Unison HomeOwner Agreements to consumers.

207. The Unison HomeOwner Agreement provides investors the benefits of increased equity realized from property ownership, without the costs or burdens of actually purchasing or owning the homes themselves. The consumers bear all the costs of homeownership, including property taxes, insurance, maintenance and repairs. Investors treat the home as a passive investment from which they can expect to realize a tremendous gain.

208. The Unison HomeOwner Agreement takes away consumers' agency over their largest asset – their home, effectively transferring control of the home to Unison.

209. Under the Unison HomeOwner Agreement, unless Defendants provide approval that lies in their "sole and absolute discretion," consumers are not permitted to rent their homes or borrow against their homes over a maximum debt limit set by Defendants. Homeowners also

cannot sell their homes without Defendants' involvement and approval. The Agreement is binding on all successors and assigns.

210. The Unison Homeowner Mortgage and Security Agreement gives Defendants a secured interest in consumers' homes and grants Defendants the statutory power of sale in the event of breach.

211. It also gives Defendants a security interest in the fixtures of the property under the Massachusetts Uniform Commercial Code, M.G.L. c. 106, § 9-101 *et seq*. If consumers default, Defendants have remedies of a secured party under the Massachusetts UCC and may proceed against the home, its fixtures, or improvements separately or together.

212. Defendants reduce their risk of property devaluation by identifying property conditions that it determines must be repaired before the end of the agreement or it recoups the amount it determines for the repair costs in its payment.

213. The Unison HomeOwner Agreement results in oppression and unfair surprise to consumers because Defendants hide the impact of the transaction and obscure many terms of the agreement, and because consumers are not privy to Defendants' sophisticated projections about the return on their investment or Defendants' business models.

214. Defendants' actions disproportionately harm the financially disadvantaged and elder homeowners – specifically, homeowners who are cash strapped, or on a fixed income, but who have accumulated equity in their homes because they have lived there for long durations or are living in family homes passed down throughout generations. Defendants have actual knowledge or reason to believe that a substantial subset of its customers are unlikely to settle the agreement with financial resources other than their equity in their home and will therefore be forced to sell their homes to repay Defendants.

215. In addition, Defendants' conduct after origination of the contract is oppressive, unfair, and/or unconscionable, and causes injury to homeowners, including Defendants' interference with homeowners' ability to obtain financing, sell or rent their homes, and providing them regularly with misleading, confusing, and unfair communications as described above, which cause homeowners stress, continue to mislead them, and otherwise cause them harm.

216. Consumer protection regulations on lending and loan products, including prohibitions on the type of conduct described in the preceding paragraphs, constitute common-law, statutory, and/or other established concepts of unfairness and/or unconscionability.

217. Whether or not one or more variants of the Unison HomeOwner Agreement is technically distinguishable from a mortgage loan, the foregoing conduct falls within at least the penumbra of concepts of unfairness intended to protect consumers from other dangerous mortgage-backed consumer financial products.

218. The Court may and should turn to these laws and regulations as a yardstick against which to measure the fairness or unfairness of the Unison HomeOwner Agreement, whether or not the Unison HomeOwner Agreement is a novel product. These laws and regulations establish the applicable concept of fairness for mortgage-backed consumer financial products even if the Court determines that Defendants succeeded in creating a product that falls into a regulatory gap.

219. Defendants knew or should have known that each of these acts or practices described above violated G.L. c. 93A, § 2.

**COUNT II**
**Unlawful Misrepresentations**
**(Violations of G.L. c. 93A, § 2; 940 C.M.R. § 3.01 *et. seq.*)**

220. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

221. The Massachusetts Consumer Protection Act, G.L. c. 93A § 2, prohibits unfair and deceptive acts and practices in trade or commerce.

222. It is a violation of G.L. c. 93A to make misrepresentations about a product which directly or by implication, or by failure to adequately disclose additional relevant information, have the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. 940 CMR 3.05(1).

223. The Massachusetts Consumer Protection Act, G.L. c. 93A, prohibits false advertising, including advertising that creates a false impression of the value of the product offered. Even if the true facts are subsequently made known to the buyer, the law is violated if the first contact or interview is secured by deception. 940 CMR 3.02(2).

224. Defendants have utilized marketing and sales communications and regular periodic loan servicing communications that have a tendency to deceive consumers by misrepresenting the Unison HomeOwner Agreements' respective risk burden between Unison and consumers, including, but not limited to, the following statements, as well as those identified in Section E:

a. "Unison is [consumers'] partner," "By partnering with Unison you do not take on any debt," and "We are 'co-investors,' not lenders.";

b. The Unison HomeOwner Agreement is a "co-investment," in which Unison "shares in the upside and the downside";

c. Under the Unison HomeOwner Agreement, Unison's "return comes only from a share of the change in value of [the consumer's] home, up or down";

d. The Unison HomeOwner Agreement "is designed to promote fairness and minimize its impact on the way [consumers] live in and manage [their] home";

e. That the Unison HomeOwner Agreement "leaves [consumers] in control—[to] manage [their] home as [they] see fit."

f. "As your financial partner, we'd love to help. Our Unison Partner Services Team is available Monday-Friday, 9 a.m. – 5 p.m. CST 1.800.330.5800 or HomePartners@unison.com."

225. These representations are materially false because:

a. Defendants are not consumers' partner, as its own contract admits in a clause buried in its agreement. Defendants disclaim this in their contracts because they know that telling consumers they have a partnership relationship with Defendants in their marketing campaign is deceptive.

b. Defendants do not act like a partner. An essential element of partnership is the sharing of losses or expenses. Unison, however, has structured this transaction so the homeowner bears all the expenses, and Unison will rarely, if ever, share any losses.

c. Defendant UIM is legally required to act in the best interest of its investors, not consumers, because it owes its investors a fiduciary duty.

d. While Unison tells homeowners that they share downside risk and are at risk of losing money from its products, it represents the opposite to its venture capital funder and other private investors.

e. The Unison HomeOwner Agreement contains numerous provisions that strip consumers of agency over their homes in order to shield Unison from risk, including a prohibition on renting and a maximum debt limit, all of which are binding on successors.

226. These misrepresentations are misleading because Unison's marketing and sales communications would lead a consumer to reasonably believe, at least initially, that the Unison HomeOwner Agreement has equal risks to Unison and consumers. It also leads consumers to reasonably believe, at least initially, that the Unison Homeowner Agreement confers upon consumers more freedom and independence to achieve financial benefits from their home equity when in fact, the Unison HomeOwner Agreement is structured to shift all the majority of the risk onto consumers, yield significant profits to Unison, and provide near total control to Unison to protect its asset for the benefit of its investors.

227. These misrepresentations are material because the cost, financial risk and/or benefits of a financial product are material facts that would impact a reasonable consumer's decision about entering into the transaction.

228. Indeed, because Unison's product is so harmful to homeowners, Unison systematically misrepresents how the product works, its substantial risks to consumers, and Unison's true relationship to consumers in order to induce more consumers to enter into Unison HomeOwner Agreements.

229. This contradiction between marketing and sales promises and contractual terms is central to Unison's scheme: consumers are led to believe they are entering into a safe, risk-sharing arrangement when in fact they are entering an illegal, high-cost mortgage loan and taking on mortgage-secured debt.

230. Unison's marketing playbook is designed to induce homeowners into transactions they would not accept if fully informed. These misrepresentations were not isolated or sporadic, but part of a years-long, uniform and sophisticated advertising campaign disseminated through brochures, websites, mailers, sales presentations and post-closing servicing communications. The campaign's central message—that the Unison HomeOwner Agreement was a low risk co-investment partnership rather than a high-cost loan requiring payments—was repeatedly reinforced and was reasonably relied upon by Plaintiffs and Class Members.

231. Each communication Unison made which was deceptive in any of the above ways is a separate violation of G.L. c. 93A, §2.

232. Unison knew or should have known that each of these acts or practices violate G.L. c. 93A, § 2(a).

**COUNT III**
**Unlawful Reverse Mortgage Lending**
**(Violations of G.L. c. 93A, § 2; G.L. c. 183, § 67,**
**G.L. c. 167E §§ 7, 7A)**
**(*In the alternative to Counts IV and V*)**

233. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

234. Massachusetts has a number of statutory and regulatory requirements governing reverse mortgages, found at G.L. c. 183, § 67 and G.L. c. 167E §§ 7, 7A. These laws limit the risk to homeowners by providing that, among other things, reverse mortgages loans are only available to consumers over sixty, who have received independent counseling, and have opted in writing to agree to the reverse mortgage loan. G.L. c. 167E, § 7(a), 7(e), § 7A(b).

235. Likewise, these laws prohibit lenders from making reverse mortgages loans on residential real property except in accordance with the provisions of G.L. c. 167E, §§ 7, 7A. *See* G.L. c. 183, § 67.

236. A reverse mortgage loan is "a loan to an owner, at least 60 years of age, of real estate secured by a mortgage, deed of trust, or equivalent consensual security interest on residential property securing one or more advances; and any principal, interest, or shared appreciation or equity is due and payable (other than in the case of default) at the end of the fixed term, if any; after the consumer dies; the dwelling is transferred; or the consumer ceases to occupy the dwelling as a principal dwelling." *See, e.g.*, 209 C.M.R. § 55.02.

237. Defendants advanced money to Plaintiffs and the Class with the expectation of repayment, thereby constituting a loan.

238. Defendants secure the loans by placing mortgages on residential real property.

239. The loans do not become due until the expiration of a fixed term, the death of the consumer, the sale or transfer of the dwelling, or a material and uncured event of default by the homeowner.

240. The loans that Defendants extend are non-recourse, which means Defendants' recovery is limited solely to the value of the property at the time the loan becomes due and payable. G.L. c. 167E, § 7(h).

241. Any borrower receiving a reverse mortgage must receive counseling by a third party approved by the Executive Office of Aging and Independence. Under G.L. c. 167E, § 7A(c), a reverse mortgage that is executed with a borrower who has not received the required counseling renders the terms of the reverse mortgage unenforceable.

242. Defendants do not comply with the reverse mortgage laws, resulting in their reverse mortgages being unfair, deceptive, and unenforceable.

243. Defendants have violated the laws and regulations governing reverse mortgages including in the following ways:

a. Extending reverse mortgages to borrowers who are younger than 60;

b. Binding applicants prior to seven days after the applicant's acceptance in writing of the lender's commitment to make the loan, in violation of G.L. c. 167E, § 7(d)(2);

c. Failing to obtain a written statement signed by the borrower acknowledging receipt of disclosure of all contractual contingencies which could force a sale of the mortgaged real estate, in violation of G.L. c. 167E, § 7(d)(3);

d. Failing to include a provision in the agreements that permits prepayment of the loan without penalty at any time before the loan becomes due and payable, in violation of G.L. c. 167E, § 7(d)(4);

e. Failing to provide the prospective borrower with written materials in plain language setting forth the loan's specific terms including the provisions that cause the loan to become due and payable, all contractual contingencies, loan fees and charges, prepayment and refinancing features,

and a statement that the mortgage has tax and estate planning consequences and may affect benefits, and that the applicant is advised to seek separate advice about these matters, in violation of G.L. c. 167E, § 7;

f. Making reverse mortgage loans without receiving notice, in writing, that the prospective borrower has completed a reverse mortgage counseling program which has been approved by the Executive Office of Aging and Independence and which shall include instruction on reverse mortgage loans and shall take place by synchronous real-time video conference or by telephone, in violation of G.L. c. 167E, §§ 7(e), 7A(b).

g. Making reverse mortgage loans without borrowers affirmatively opting in writing for the loan or in conformance with the "Opt in Form" as required by G.L. c. 167E, § 7A(b)(i),

h. Making reverse mortgage loans without receiving written certification from a counselor with a third-party organization that the borrower has received counseling in person as to the appropriateness of the loan transaction, by an organization certified to provide such counseling, in violation of G.L. c. 167E, § 7A(b)(ii),

i. Making reverse mortgage loans on residential real property without complying with sections 7 and 7A of G.L. c. 167E, in violation of G.L. c. 183 § 67.

244. Defendants' violations of the reverse mortgage lending requirements are unfair and deceptive practices and constitute violations of G.L. c. 93A § 2.

245. Defendants knew or should have known that each of these acts or practices described above violated G.L. c. 93A, § 2.

**COUNT IV**
**Unlawful Lending - MCCCDA**
**(Violations of G.L. c. 93A, § 2; G.L. c. 140D, § 1 *et seq.*;**
**940 C.M.R. § 8.01 *et seq.*)**
***(In the alternative to Count III)***

246. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

247. The MCCCDA promotes the informed use of consumer credit by requiring creditors to provide disclosures to consumers about the terms of credit and its cost.

248. Under the MCCCDA, "credit" is the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment. G.L. c. 140D, § 1.

249. A "creditor" is a "a person who both (1) regularly extends…consumer credit . . . for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." G.L. c. 140D, § 1.

250. A "finance charge" includes "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit" and is further defined in G.L. c. 140D, § 4.

251. Defendants are extending "credit" because they advance money to Plaintiffs and the Class, the repayment of which is deferred until the Unison HomeOwner Agreement terminates or upon an exercise event.

252. Defendants are "creditors" because the credit they extend includes or may require a finance charge, including the fees that are assessed to Plaintiffs and the Class at origination. Further, the Unison HomeOwner Agreement is designed to generate a profit for Unison, meaning that in almost all circumstances, the amount Plaintiffs and the Class owe Defendants at the conclusion of the Unison HomeOwner Agreement will exceed the initial amounts advanced to them. Additionally, Defendants are the persons to whom the debt is payable. Finally, Defendants regularly extend credit because they have entered into thousands of Unison HomeOwner Agreements with consumers. Accordingly, Defendants are creditors, as defined by G.L. c. 140D, § 1.

253. The credit extended by Defendants is consumer credit because Plaintiffs and the Class incurred the debt for personal, family, or household purposes.

254. Accordingly, Defendants are required to comply with the MCCCDA provisions governing creditors in consumer credit transactions.

255. The MCCCDA requires creditors to provide certain information before the credit is extended, including but not limited to:

a. An appropriate notice of the right to rescind the transaction. G.L. c. 140D, § 10(a).

b. "The 'amount financed', using that term, which is the amount of credit of which the consumer has actual use and a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed." G.L. c. 140D § 12(a)(2)(A);

c. "A statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed." G.L. c. 140D § 12(a)(2)(B);

d. "The 'finance charge,' not itemized, using that term." G.L. c. 140D § 12(a)(3).

e. "The finance charge expressed as an 'annual percentage rate', using that term." G.L. c. 140D § 12(a)(4).

f. "The sum of the amount financed and the finance charge, which shall be termed 'total payments.'" G.L. c. 140D § 12(a)(4).

256. Defendants did not make the disclosures required by the MCCCDA, including those enumerated above, and thereby violated the MCCCDA.

257. Moreover, these disclosures "shall be conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization." G.L. c. 140D, § 12(b)(1); G.L. c. 140D, § 8. Because Defendants failed to make these disclosures, they also violated the provision requiring their conspicuous segregation.

258. Defendants' violations of the MCCCDA are unfair and deceptive practices and constitute per se violations of G.L. c. 93A § 2. G.L. c. 140D § 34.

259. Defendants knew or should have known that each of these acts or practices described above violated G.L. c. 93A, § 2.

**COUNT V**
**Unlawful Lending - Mortgage Lending Regulations**
**(Violations of G.L. c. 93A, § 2; 940 C.M.R. § 8.01 *et seq.*)**
**(*In the alternative to Count III*)**

260. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

261. The Attorney General has also implemented a number of regulations that are "designed to protect Massachusetts consumers seeking residential mortgage loans and to ensure that the mortgage industry is operating fairly and honestly by means of legitimate and responsible business acts and practices that are neither unfair nor deceptive." 940 C.M.R. § 8.01.

262. Under these laws and regulations, "mortgage lenders" are any "person[s] engaged in the business of making mortgage loans." 940 C.M.R. § 8.03. "Mortgage loans" are defined as loans "to a natural person made primarily for personal, family or household purposes secured wholly or partially by a mortgage on a residential property." 940 C.M.R. § 8.03.

263. Defendants extend mortgage loans because they advance money to Plaintiffs and the Class with the expectation of future repayment when the Unison HomeOwner Agreement terminates or upon an exercise event. Because those loans are secured by recording mortgages on Plaintiffs' and the Class' residential property, they are residential mortgage loans and Defendants are mortgage lenders, as defined in 940 C.M.R. § 8.03.

264. Defendants have violated provisions regarding the activity of mortgage lenders, including but not limited to:

a. Defendants make representations in their advertisements that are misleading or have the tendency or capacity to be misleading, including but not limited to misrepresentations that Defendants' products are interest-free, that they do not create debt, that they are not a loan, and that Defendants are in partnership with consumers, in violation of 940 C.M.R. § 8.04(1);

b. As mortgage lenders, Defendants are required to include the word "lender" and a license number in any advertisement. They have failed to do so, in violation of 940 C.M.R. § 8.04(2);

c. Defendants engage in bait advertising or misrepresent or fail to disclose the terms, conditions or charges incident to the mortgage loan being advertised in the advertisements, in violation of 940 C.M.R. § 8.04(4);

d. Defendants advertised a product that does not comply with applicable lending laws, in violation of 940 C.M.R. § 8.04(5);

e. Defendants fail to make disclosures required by state and federal law, in violation of 940 C.M.R. § 8.05(1);

f. Defendants concealed or failed to disclose to Plaintiffs and the Class facts relating to the loan transaction, the disclosure of which may have influenced the borrower not to enter in the transaction, in violation of 940 C.M.R. § 8.05(2);

g. Defendants have made representation and statements of facts that are false or misleading or have the tendency or capacity to be misleading, including misrepresentations about the availability, terms, conditions, or charges incident to the mortgage transaction, in violation of 940 C.M.R. § 8.06(1);

h. Defendants have accepted application fees or other fees prior to the borrower's receipt of mandated disclosure forms in violation of 940 C.M.R. § 8.06(3);

i. Defendants procure mortgage loans with rates or other terms that significantly deviate from industry-wide standards or which are otherwise unconscionable in violation of 940 C.M.R. § 8.06(6);

j. Defendants charge a prepayment fee that deviates from industry-wide standards and is otherwise unconscionable in violation of 940 C.M.R. § 8.06(10);

265. These acts and practices have been declared unfair or deceptive by the regulations cited.

266. These violations of the mortgage lending requirements are unfair and deceptive practices that constitute violations of G.L. c. 93A, § 2.

267. Defendants knew or should have known that each of these acts or practices described above violated G.L. c. 93A, § 2.

**COUNT VI**
**Unfair and Deceptive Interest Rate Practices**
**(Violation of G.L. c. 93A, § 2)**

268. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

269. Massachusetts' anti-usury statute prohibits persons from knowingly contracting for or charging interest and expenses that in the aggregate exceed 20% per annum. G.L. c. 271 § 49(a).

270. Accordingly, a loan at a rate of interest that in the aggregate exceeds 20% per annum may be declared void. G.L. c. 271 § 49(c).

271. The anti-usury statute's prohibition against unlawful interest applies unless a person has notified the Attorney General of their intention to engage in a loan at a higher rate of interest than permitted by G.L. c. 271 § 49(a) and maintains records available for inspection that document key aspects of the loan, such as the amount borrowed and the interest and expenses to be paid by the borrower. G.L. c. 271, § 49(d).

272. Defendants extend loans because they advance money to Plaintiffs and the Class with the expectation of future repayment when the Unison HomeOwner Agreement terminates or upon an exercise event.

273. Defendants have structured their products such that consumers' repayment at the end of the term or upon an exercise event is often several times the initial amount advanced to the consumer, thereby constituting interest.

274. The interest accrued over the course of the Unison product is very high and can exceed 20% per annum.

275. Defendants know or could ascertain by reasonable inquiry that the interest on their Unison HomeOwner Agreements is likely to exceed 20% per annum, thereby causing substantial injury to Plaintiffs and the Class:

a. Defendants tout to investors their "20.7% net annualized return" over a ten-year period.

b. Defendants use highly sophisticated forecasting that allows them to select the most lucrative markets in which they will operate and thereby extend loans on properties whose values are most likely to appreciate. The more a home appreciates in value, the more Defendants reap in interest upon the termination of the Unison HomeOwner Agreement or upon an exercise event.

c. Defendants have not placed an interest rate cap in their Unison HomeOwner Agreements, thereby failing to take steps to prevent consumers from being charged usurious interest.

d. Defendants incorporate several provisions into the Unison HomeOwner Agreement designed to increase Unison's return, including setting the Original Agreed Value and the Ending Agreed Value. These provisions increase the amount of money due to Unison at the conclusion of the Unison HomeOwner Agreement, in amounts that can exceed 20% per annum.

276. Defendants misrepresent their products as interest-free, which means Plaintiffs and the Class do not reasonably anticipate they may be charged usurious interest and are therefore unprepared, and often unable, to repay Defendants at the end of the term or upon an exercise event. As a result, many homeowners must sell their home at the conclusion of the Unison HomeOwner Agreement to repay the usurious or excessive interest rate.

277. Despite Defendants' knowledge that their loans are likely to result in very high interest rates, including rates that could be usurious and exceed 20% per annum, Defendants

have failed to provide the Attorney General with the required notice. As a result, Defendants have evaded oversight that could otherwise protect homeowners from usurious interest rates.

278. Additionally, even though Defendants' products carry excessive and, at times, usurious interest rates, Defendants market their products as "interest free" or as a "no interest" loan alternative. These statements are unfair and deceptive because they misrepresent the true nature of the Unison product and have the capacity or tendency to mislead consumers acting reasonably in the circumstances.

279. As an example of excessive interest rates, Mr. Hills would incur a simple interest rate of up to 56.78%, and an APR of up to 24.4%, based on Defendants' most recent Quarterly Statement.

280. Defendants' actions and representations regarding the interest rate on the Unison HomeOwner Agreement violate G.L. c. 93A § 2.

281. Defendants knew or should have known that each of these acts or practices described above violated G.L. c. 93A, § 2.

**COUNT VII**
**Quiet Title**
**(G.L. c. 240, §§ 6–10)**

282. The allegations contained in the foregoing paragraphs are hereby re-alleged and incorporated herein.

283. A quiet title action is available when an entity such as Unison claims an interest in real property, which another party, such as Plaintiffs, contest and seek to produce evidence to support their claim. G. L. c. 240, § 6.

284. Plaintiff Anne Cuvellier is the fee simple owner of residential real property located at 192 Mountainview Road, East Longmeadow, Massachusetts 01028, where she has resided since 1990.

285. Plaintiff David Hills is the fee simple owner of residential real property located at 412 Bishops Terrace, Hyannis, Massachusetts 02601, where he has resided since 1972.

286. Plaintiffs bring this claim individually with respect to their respective properties and, on behalf of the Class, seek parallel quiet title relief as to all properties encumbered by Defendants' mortgages securing Unison HomeOwner Agreements.

287. Plaintiffs and the Class hold claim to their homes, which are their principal residences.

288. Defendants claim adverse interests in the homes of Plaintiff and the Class by virtue of mortgages recorded to secure obligations allegedly arising under Unison HomeOwner Agreements.

289. The mortgages and Defendants' purported interests are invalid and unenforceable because the underlying Unison HomeOwner Agreements are unlawful, subject to cancellation, void, or voidable, as set forth above.

290. An actual controversy exists as to the parties' respective rights and interests in Plaintiffs' and the Class' properties. The mortgages recorded by Defendants constitute present and continuing clouds on title that impair homeowners' ability to sell, refinance, or transfer their properties. Unless the Court declares the mortgages void and cancels them of record, Plaintiffs' and the Class' titles will remain clouded and their property rights impaired.

**COUNT VIII**
**Declaratory Judgment,**
**28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57**

291. Plaintiffs incorporate the preceding paragraphs by reference.

292. Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, the Court may declare the rights or legal relations of any party in a case of actual controversy.

293. The declaratory relief requested clarifies the rights, status, and obligations of the parties.

294. A substantial controversy exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other, concerning the validity and enforceability of Unison HomeOwner Agreements and the mortgages recorded to secure them. Plaintiffs seek declaratory relief for the purposes of determining questions of actual controversy between themselves and the Class and Defendants.

295. Defendants have acted in a uniform manner by a) inducing Plaintiffs and the Class to enter into Unison HomeOwner Agreements that violate the laws set forth above, and b) attempting to enforce and collect on those loan obligations, including through imposition of a mortgage and security agreement that encumbers title to the property, creates a secured debt, and places Plaintiffs and the Class at risk of foreclosure or forced sale.

296. Plaintiffs and the Class were deprived of the disclosures and substantive limitations set forth in Massachusetts law for consumer protection generally, consumer lending, and mortgage lending specifically.

297. The Unison HomeOwner Agreements are unfair, deceptive and unconscionable products.

298. As a result, Plaintiffs and the Class are subjected to contracts that violate the law and are subject to ongoing legal harm absent a declaration regarding their rights and remedies.

299. Plaintiffs seek declarations to determine their rights and the rights of the Class, in particular, that the Court find that Defendants and Plaintiffs and the Class did not enter into any legal contract, either express or implied-in-fact, for Plaintiffs and the Class to pay the amounts imposed by the Defendants and declare all such contracts void, voidable, invalid, cancelled

and/or otherwise unenforceable and declare all attempts to enforce the contracts be contrary to law.

300. Accordingly, Plaintiffs and the Class respectfully request the Court to issue a declaratory judgment that Defendants violated Massachusetts law as set forth above and are entitled to each of the remedies provided for therein.

301. Plaintiffs further seek a declaration, pursuant to these provisions, that (a) Defendants' contracts and liens are unenforceable, cancelled, void, and/or invalid, and that no amounts are owed; and/or (b) Defendants cannot impose or collect a finance charge or interest from the Plaintiffs or similarly situated consumers; and (c) such other necessary and proper relief that may be appropriate following the determination of the declarations made.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

a. Certify the case as a class action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs and their attorneys as Class representatives and Class counsel, respectively;

b. Enter an order declaring the Defendants jointly and severally liable;

c. Enter an order providing for any and all injunctive, equitable, and declaratory relief the Court deems appropriate, including but not limited to declaring that Defendants' contracts and liens are unenforceable, cancelled, void, and/or invalid, and that no amounts are owed;

d. Enter an order declaring that each and every Unison HomeOwner Agreement between Defendants and Plaintiffs and the Class is an unlawful mortgage loan and/or form of consumer credit, or in the alternative a reverse mortgage loan, and subject to the Massachusetts laws cited herein;

e. Enter an order declaring that Defendants are mortgage lenders and/or creditors, or in the alternative, make reverse mortgage loans;

f. Enter an order declaring that Defendants cannot impose a finance charge or interest on the Plaintiffs or the Class;

g. Issue a permanent injunction barring Defendants from further violations of each and every Massachusetts statute and regulation set forth herein;

h. Enter a judgment quieting title in favor of Plaintiffs and the Class declaring that Defendants have no valid lien, title, or interest in their homes by virtue of the Unison HomeOwner Agreements, mortgages or security interests, and order cancellation of such instruments of record;

i. Enter an order requiring Defendants to pay monetary damages to Plaintiffs and any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

j. Enter an order requiring Defendants to pay Plaintiffs all available statutory damages, including twice the finance charge paid as permitted by statute, including G.L. c. 93A, § 9, G.L. c. 140D, § 32(b);

k. Enter an order requiring Defendants to disgorge all money, equity interests, profits, and other benefits wrongfully obtained from Plaintiffs and the Class as a result of Defendants' unlawful and unfair business practices;

l. Enter an order that the fee-shifting provision in the Unison HomeOwner Agreement is invalid, void, and unenforceable.

m. Enter an order requiring Defendants to pay reasonable attorneys' fees and costs for Plaintiffs' investigation into and prosecution of this action;

n. Grant additional declaratory, injunctive, and equitable relief as the Court may deem just and proper;

o. Enter an order for such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

302. Plaintiffs hereby demand trial by jury as to all issues so triable in the above matter.

Respectfully Submitted,

Dated: August 5, 2026

**NATIONAL CONSUMER LAW CENTER**

*<u>/s/ Shennan Kavanagh</u>*
Shennan Kavanagh (BBO #655174)
Jennifer Wagner (BBO #716264)
National Consumer Law Center
7 Winthrop Square, 4th Floor

Boston, MA 02110
p. 617.542.8010
f. 617.542.8028
skavanagh@nclc.org
jwagner@nclc.org

**SINGLETON SCHREIBER, LLP**
Elizabeth Aniskevich (D.C. Bar No. 994603)*
Jennifer Yadoo (D.C. Bar No. 1780435)*
SINGLETON SCHREIBER, LLP
650 Massachusetts Ave NW, Suite 600
Washington, DC 20001
Telephone: (619) 771-3473
eaniskevich@singletonschreiber.com
jyadoo@singletonschreiber.com

*Attorneys for Plaintiffs and Proposed Class*
**Pro hac vice applications forthcoming*